**AFFIRMED and Opinion Filed December 11, 2020**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-18-01342-CV**

**KENNETH D. MURPHY, Appellant**
**V.**
**ALFONSO FELIPE MEJIA ARCOS, Appellee**

**On Appeal from the 68th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-16-11187**

## OPINION ON REHEARING

Before Justices Myers, Carlyle, and Evans
Opinion by Justice Evans

Appellee Alfonso Felipe Mejia Arcos filed a motion for en banc rehearing.

On our own motion, we withdraw our opinion and judgment of July 17, 2020. This

is now the opinion of the Court.

This is an appeal from a personal injury lawsuit arising out of an automobile

accident between appellant Kenneth D. Murphy and appellee Alfonso Felipe Mejia

Arcos. During jury selection, the trial court sustained Mejia's *Batson* challenges to

peremptory strikes exercised against prospective jurors 7 and 20, but denied his

*Batson* challenge to prospective juror 6. *See Batson v. Kentucky*, 476 U.S. 79 (1986).

The jury found for Mejia and awarded $1,070,500. Three weeks after trial and

without a hearing, the trial court granted Mejia's motion for judgment by signing a judgment based on the verdict. In response to Murphy's subsequent motions, Mejia sought and obtained leave of court to file his second amended petition to increase his maximum amount pleaded from $200,000 to conform to the verdict. The trial court signed an amended final judgment the same day it granted leave to Mejia to file his second amended petition.

In two issues, Murphy contends the trial court erred by (1) sustaining two of Mejia's *Batson* challenges and (2) granting Mejia's motion for leave to amend his first amended petition to conform to the jury's damages award and granting judgment in excess of $200,000. We conclude in the first issue the trial court did not abuse its discretion in granting Mejia's *Batson* challenges.

Murphy's second issue presents a matter of first impression. In our original opinion, we concluded the trial court abused its discretion granting leave to file a trial amendment after judgment and erred in granting judgment in excess of the maximum amount in Mejia's live pleading. Having now considered the arguments Mejia urged for the first time in his motion for en banc rehearing, we conclude that the more reasonable view is that the amended final judgment had the legal effect of vacating the original judgment as though it had never been entered, so Mejia's motion for leave to file his second amended petition preceded the amended final judgment. The result of this analysis is the trial court did not abuse its discretion when it granted Mejia leave to file his amended petition, so the trial court did not err

in granting the amended final judgment in the full amount awarded by the jury. We therefore affirm the judgment of the trial court.

## BACKGROUND

Mejia sued Murphy for personal injury damages arising out of a November 2015 rear-end collision on Garland Road in Dallas County. Murphy denied liability, and the case proceeded to a jury trial. We focus on the procedural facts related to Murphy's two issues.

### *Voir Dire and the* **Batson** *Challenges*

The trial court instructed the lawyers before they began voir dire that the court would raise and deal with certain issues including any prospective juror's difficulty with English.[1] When the trial court read the portion of the general instructions requiring the prospective jurors to follow the instructions being read to them,[2] the trial court sought to emphasize the point by asking the following questions which resulted in several prospective jurors identifying themselves as having difficulty with English, including prospective jurors 7 and 20:

---

[1] The trial court stated, "Also, English issues, I'll deal with those as well. I'll ask if they have an English issue, and then I'll bring them back individually." There were times during voir dire the reporter noted English issues such as, "(Venireman attempting to translate for Venireman No. 3.)." Followed by, "THE COURT: You can't speak to him in Spanish, guys. You can't speak to him in Spanish." All such matters were addressed to the satisfaction of the parties because no complaint is raised on appeal other than to prospective jurors 7 and 20.

[2] Rule 226a requires, "The court must give instructions to the jury panel and the jury as prescribed by order of the Supreme Court under this rule." TEX. R. CIV. P. 226a. Over the years, the Texas Supreme Court has issued several iterations of the jury instructions, which are published in West's Texas Rules Annotated immediately following rule 226a.

THE COURT: . . . How many people believe that I as the Judge should have to follow the law? Raise your juror numbers. All right. Number 3 and number 7.

. . . .

And then number 7, Mr. Marban, do you understand what I just said?

(Venireman gestures.)

THE COURT: A little bit. Okay. You may have an English issue. And then I think number -- Ms. Gil-Rodriguez, did you raise your juror number, I didn't see it?

VENIREMAN NO. 20: A little bit.

THE COURT: English, okay. We'll talk to you guys as well.

In addition to prospective jurors 7 and 20, others self-identified as having difficulty with English. Also, prospective juror 6 identified herself as having been hit from the rear while stopped at a stop sign and still feeling pain in her neck from injuries she sustained in the collision. Other prospective jurors also said they had been involved in collisions.

During the attorneys' opportunity to question the venire panel, Murphy's counsel asked prospective juror 7 these questions:

[MURPHY'S COUNSEL]: Mr. Marban, do you understand me?

VENIREMAN NO. 7: A little bit.

[MURPHY'S COUNSEL]: Poquito?

VENIREMAN NO. 7: Uh-huh.

[MURPHY'S COUNSEL]: Okay. Do you work?

VENIREMAN NO. 7: Yes.

–4–

[MURPHY'S COUNSEL]: What do you do for a living?

VENIREMAN NO 7: Furniture installer.

[MURPHY'S COUNSEL]: Furniture installer.

VENIREMAN NO. 7: Yes, sir.

[MURPHY'S COUNSEL]: Have you ever been injured doing your job?

VENIREMAN NO. 7: No.

[MURPHY'S COUNSEL]: I'm happy for you. Are you married?

VENIREMAN NO. 7: Yes, sir.

[MURPHY'S COUNSEL]: And does your wife work?

VENIREMAN NO. 7: No. She's at the house.

When the lawyers finished their questions, the prospective jurors were excused to wait in the hall and told some of them might be called back into the courtroom individually. Prospective juror 7 gave these answers to questions:

THE COURT: . . . . Let's bring in number 7. He also has an English issue.

(Venireman Marban entering courtroom.)

THE COURT: Mr. Marban, why don't you come on up. Mr. Marban, you're a furniture installer, is that right?

VENIREMAN NO. 7: Yes, sir.

THE COURT: And where do you work?

VENIREMAN NO. 7: In many places.

THE COURT: Many places. Okay.

VENIREMAN NO. 7: Yes, sir.

THE COURT:  As part of being a furniture installer, do you have to read and write English?

VENIREMAN NO. 7:  A little bit.

THE COURT:  So you do read and write English?

VENIREMAN NO. 7:  Some. I went to school, but --

THE COURT:  You went to school in the United States?

VENIREMAN NO. 7:  Yes, sir. And I took many course (sic), but I work first because I have three kids, right?

THE COURT:  Okay.

VENIREMAN NO. 7:  But it's difficult for me.  But I understand some things.

THE COURT:  You understand English and you read and write English?

VENIREMAN NO. 7:  Yes.

THE COURT:  But Spanish is your first language?

VENIREMAN NO. 7:  Yes, sir.

THE COURT:  Okay.  All right.  Thank you Mr. Marban.  Just wait outside and we'll let you know something in a few minutes, if you're going to be on the jury, okay?

VENIREMAN NO. 7:  Thank you.

THE COURT:  Thank you.  And you did go to school in the United States, correct?

VENIREMAN No. 7:  Yes. I took many course in Brook Haven school.

THE COURT:  Oh, Brookhaven College?

VENIREMAN NO. 7:  Yes.

THE COURT:  Okay.  And those were in English?

VENIREMAN NO. 7:  But my English is . . . .

THE COURT:  I understand.  It doesn't have to be perfect.

VENIREMAN NO. 7:  I try.  I try.

THE COURT:  I appreciate it Mr. Marban.  Thank you so much.

VENIREMAN NO. 7:  Thank you.

After prospective juror 7 left the courtroom, there was no discussion, motion, or ruling about him.  Other jurors were interviewed, then the trial court and counsel had this exchange with prospective juror 20:

THE COURT:  . . . .  Bring in number 20.  Has an issue with English.

(Venireman Rodriguez entering courtroom.)

THE COURT:  Ma'am, can you come on up?  I had a couple of questions for you.  Is your name Jesus?

VENIREMAN NO. 20:  Yes.

THE COURT:  That is your name?

VENIREMAN NO. 20:  Yes.

THE COURT:  That's not your husband's name?

VENIREMAN NO. 20:  No, it's my name.

THE COURT:  This is the name you go by is Jesus.  Okay.  And you had an issue with English, is that right?  Do you read and write English?

VENIREMAN NO. 20:  Yes, a little bit.  Not one hundred percent.

[MURPHY'S COUNSEL]:  I'm sorry, what?

VENIREMAN NO. 20:  Not one hundred percent, English.

THE COURT:  But you read and write English.  Where do you work?

VENIREMAN NO. 20:  In a warehouse.

THE COURT:  In a warehouse.  And as part of your job, do you have to read and write English in order to put things away?

VENIREMAN NO. 20:  No.

THE COURT:  You don't?  Where did you go to school?

VENIREMAN NO. 20:  Sometimes in the --

THE COURT:  No, did you go to school in the United States or in Mexico?

VENIREMAN NO. 20:  Oh, in Mexico.

THE COURT:  In Mexico.  Did you ever take courses in the United States?

VENIREMAN NO. 20:  Uh-huh, yes.

THE COURT:  Where did you take courses?

VENIREMAN NO. 20:  Only for English.

THE COURT:  Oh, you took English courses in the United States?

VENIREMAN NO. 20:  Uh-huh.

THE COURT:  And so, for example, if we gave you an English newspaper, would you be able to read it?

VENIREMAN NO. 20:  No.

THE COURT:  You said you do -- but you could read and write English?

VENIREMAN NO. 20:  Yes, a little bit.

THE COURT:  A little bit.  How much can you read in English?

VENIREMAN NO. 20:  50 percent.

THE COURT:  50 percent.  Okay.  Anybody else have any questions?

[MEJIA'S COUNSEL]:  Is that the only course that you've taken here for education?  The only course that you've taken is English?

VENIREMAN NO. 20:  Uh-huh.

[MEJIA'S COUNSEL]:  Is that a yes?  And did you finish that course?

VENIREMAN NO. 20:  No.

[MEJIA'S COUNSEL]:  Okay.  Any other courses for English before that?

VENIREMAN NO. 20:  No.

[MEJIA'S COUNSEL]:  Do you have anyone in your family that speaks fluent English?

VENIREMAN NO. 20:  My daughter.

[MEJIA'S COUNSEL]:  Your dad?

VENIREMAN NO. 20:  My daughter.

THE COURT:  Daughter.

[MEJIA'S COUNSEL]:  Daughter?

VENIREMAN NO. 20:  Uh-huh.

[MEJIA'S COUNSEL]:  Okay.

[MURPHY'S COUNSEL]:  May I, Your Honor?

THE COURT:  Sure.

[MURPHY'S COUNSEL]:  Ms. Rodriguez, the English course you took, that was English as a second language?

VENIREMAN NO. 20:  Yes.

[MURPHY'S COUNSEL]:  ESL?

VENIREMAN NO. 20:  Uh-huh.

[MURPHY'S COUNSEL]:  And you did not complete that course?

VENIREMAN NO. 20:  No.

[MURPHY'S COUNSEL]: Now, in your job, do you ever have to write in English?

VENIREMAN NO. 20:  No.

[MURPHY'S COUNSEL]: And when you read things in your job, do you have English and Spanish together that you can read?

VENIREMAN NO. 20: At my job? No. In Spanish.

[MURPHY'S COUNSEL]: It's only in Spanish on your job? Yes?

VENIREMAN NO. 20: Yes.

[MURPHY'S COUNSEL]: Is that why you say that you can understand 50 percent in English?

VENIREMAN NO. 20: Yes, because I study a little bit.

[MURPHY'S COUNSEL]: That's why?

VENIREMAN NO. 20: I study a little bit.

[MURPHY'S COUNSEL]: Okay. But your work, it's always in Spanish for you to read, is that right?

VENIREMAN NO. 20: Yes.

[MURPHY'S COUNSEL]: No further questions, Your Honor.

THE COURT: Let me ask you this. When was the last time you read something in English?

VENIREMAN NO. 20: Two years ago.

THE COURT: Two years ago, you said? When you got this questionnaire in the mail, did you fill it out or did your daughter fill it out?

VENIREMAN NO. 20: No, I.

THE COURT: You filled out the questionnaire?

VENIREMAN NO. 20: Uh-huh.

THE COURT: And the questionnaire was in English and you were able to understand it and fill it out?

VENIREMAN NO. 20: Uh-huh.

THE COURT: Correct?

–10–

VENIREMAN NO. 20:  Yes.  I'm most understand reading English.

THE COURT:  You can read English, and write English, is that correct?

VENIREMAN NO. 20:  Uh-huh.

THE COURT:  Okay.  And that's a yes?

VENIREMAN NO. 20:  Yes.

THE COURT:  Okay.  All right.  Thank you Ms. Gil-Rodriguez.  You can wait outside and we'll let you know something in a few minutes.

When prospective juror 20, Ms. Gil-Rodriguez, left the courtroom, Mejia's counsel said, "She's good," but Murphy's counsel said, "[L]et her go for cause." The trial court attempted to get the lawyers to agree on their decision about her. Mejia's counsel announced they could not agree, so the court announced its ruling:

> THE COURT: I think she technically qualifies. She said she reads and writes English, not very well, but that's not what the standard is. There's not a test to be a juror.  So, I'm not opposed to striking her if there's an agreement, but I don't think she's disqualified.

Nothing further was said about prospective juror 20.

At the conclusion of voir dire, each side made six peremptory strikes of prospective jurors.  Murphy's strikes included numbers 6, 7, and 20.  Mejia objected, citing *Batson*.  The trial court proceeded through the three steps to decide the *Batson* challenges.  In the first step, Mejia argued and the trial court ruled numbers 6, 7, and 20 were Hispanic[3] and were a protected class.

---

[3] In the record, the parties and the trial court referred to the Spanish-speaking Latino potential jurors as Hispanic.  That is also the nomenclature used by the United States Census Bureau.  In *Hernandez*, the United States Supreme Court deferred to the parties' use of Latino, instead of the Mexican American Legal Defense and Educational Fund's amicus curiae brief's use of Hispanic.  The Supreme Court stated, "No

In the second step, Murphy explained that he struck prospective juror 6 because she suffered from injuries sustained in a car accident, thus she was similarly situated to Mejia. As to prospective jurors 7 and 20, Murphy explained he struck 20 for the same reason as 7 because he knew Mejia would testify in Spanish which would be translated into English and "there's a danger to [Murphy] that [prospective juror 7] will be listening to the Spanish and not to the English interpretation as he should. And therefore . . . he was struck because he doesn't understand in English well enough, Your Honor, to participate in this trial." The trial court found that Murphy's reasons given for prospective jurors 7 and 20 were not race-neutral, so the trial court sustained Mejia's *Batson* challenges to those strikes at the second step of the analysis. But the trial court found the reason Murphy gave for striking prospective juror 6—similar car accident with continuing pain—was race neutral. So as to number 6, the trial court proceeded through the third step of the *Batson* analysis.

In the third step of the *Batson* challenge to prospective juror 6, the trial court considered the percentage of peremptory strikes of Hispanics (50%) compared to the percentage of Hispanics on the venire panel (25%) and other statistical information, whether meaningful questions were directed to the challenged jurors, disparate

attempt has been made at a distinction by the parties and we make no attempt to distinguish the terms in this opinion." *See Hernandez v. New York,* 500 U.S. 352, 355 (1991). We, too, make no distinction between the terms, and we will follow the high Court's lead by deferring to the use of Hispanic by the parties before us.

striking of the challenged jurors and prospective jurors with similar characteristics, disparate examination of challenged jurors compared to the rest of the panel, whether the explanation offered was based on a group characteristic when the challenged juror was not shown to have such a group trait, and whether the reason given related to the facts of the case. Counsel and the trial court agreed other *Batson* considerations did not apply, such as use of a shuffle to move minority jurors to the rear of the panel (there was no shuffle), or a history of systematically excluding members of a protected class from juries (no evidence of such in this civil trial). After discussing all these matters with counsel, the trial court overruled the *Batson* challenge to prospective juror 6 and excluded her from jury service.

The trial court empaneled jurors 7 and 20 as members of the jury that decided the case. After hearing all the evidence, the jury returned a unanimous verdict in Mejia's favor in the aggregate amount of $1,102,659.

### *Leave to File the Amended Petition and Judgment in Excess of Petition*

Two weeks after the verdict was received, Mejia filed a motion for judgment and provided a form of judgment, which the trial court signed three days after filing without a hearing. Murphy filed several motions including a request to modify, correct, or reform the judgment, arguing the trial court (1) could not enter judgment exceeding $200,000, because Mejia's live pleading was his first amended petition which sought damages "of over $100,000, but not more than $200,000," and (2) should correct the pre-judgment interest calculation. Responding to Murphy's

–13–

motions, Mejia filed a motion for leave to amend his second amended petition "to correct the monetary amount which [he sought]" to $1,200,000. Murphy filed a response arguing that the trial court could not grant amendment of pleadings post-judgment and that the court had already signed the final judgment. The trial court set the motions for a hearing.

At the hearing, the trial court orally announced its decision to vacate its judgment to correct the pre-judgment interest calculation but did not rule on Mejia's motion for leave to amend his petition. The trial court never signed a written order expressly vacating its judgment. Four days after the hearing, the trial court signed an order granting Mejia's motion for leave to amend his pleading and, that same day, signed an amended final judgment reflecting the jury's entire damages award. Murphy appeals the trial court's amended final judgment.

## ANALYSIS

### I.  *Batson* Challenges

In his first issue, Murphy contends the trial court abused its discretion by sustaining Mejia's *Batson* challenges as to Juror Nos. 7 and 20. Murphy argues he provided a race-neutral reason for striking those jurors. He argues *Hernandez v. New York*, 500 U.S. 352 (1991), and *Chavarria v. State*, No. 05-98-0595-CR, 2000 WL 567072 (Tex. App.—Dallas May 9, 2000, pet. ref'd) (mem. op., not designated for publication), hold that striking Hispanic, Spanish-speaking jurors when an

–14–

interpreter will translate Spanish-language testimony does not violate *Batson*'s principle of race neutrality.

## A. Standard of Review and Applicable Law

In contrast to the federal system, which employs a "clearly erroneous" standard of review, we review a trial court's *Batson* ruling for an abuse of discretion. *Davis v. Fisk Elec. Co.*, 268 S.W.3d 508, 515 (Tex. 2008). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or legal principles. *Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex. 1997).

Our rules generally permit each party in a civil action in district court to exercise six peremptory strikes which, are used to "strike" potential jurors without offering any reason or explanation. TEX. R. CIV. P. 232, 233. While no reasons for the strikes are required, peremptory strikes exercised for an improper reason, such as race, are unconstitutional. *Batson*, 476 U.S. at 89.

We resolve a *Batson* challenge using a three-step process. *Id*. at 97; *Davis*, 268 S.W.3d at 514 n.4. At the first step, the party challenging the peremptory strike must establish a prima facie case of racial discrimination. *Batson*, 476 U.S. at 97; *Davis*, 268 S.W.3d at 514 n.4. To establish a prima facie case, the challenging party may rely on "the totality of the relevant facts" giving rise to an inference of discriminatory purpose. *Batson*, 476 U.S. at 93–94.

Once a prima facie case has been established, at the second step the burden shifts to the striking party to come forward with a race-neutral explanation for the

strikes. *Id.* at 98; *Davis*, 268 S.W.3d at 514 n.4. The race-neutral explanation is a burden of production only. *See Peetz v. State*, 180 S.W.3d 755, 758–59 (Tex. App.—Houston [14th Dist.] 2005, no pet.). This means that the reason offered need not be "persuasive or even plausible," so long as it is clear, reasonably specific, and "based on something other than the juror's race." *Purkett v. Elem*, 514 U.S. 765, 768 (1995); *Goode*, 943 S.W.2d at 445. Thus, at this second step, the trial court's sole task is to determine whether the explanation is facially valid. *Purkett*, 514 U.S. at 768.

If the striking party offers a race-neutral explanation, at the third step the challenging party must prove purposeful racial discrimination. *Batson,* 476 U.S. at 98; *Davis*, 268 S.W.3d at 514 n.4. At this step, the persuasiveness of the justification for the peremptory strike is the critical issue, and "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768.

Making its pretext determination, the trial court must consider "all relevant circumstances." *Batson*, 476 U.S. at 96–97; *Davis*, 268 S.W.3d at 516–24. In *Miller-El v. Dretke* (*Miller-El II*), the Supreme Court analyzed certain factors it recognized as especially probative, including (i) whether a statistical disparity exists between the percentage of black and non-black potential jurors who were struck, (ii) whether the striking party questioned the black potential jurors before striking them, and (iii) whether the record supports or contradicts the striking party's

–16–

explanation for its strikes. 545 U.S. 231, 239 (2005); *see also Davis*, 268 S.W.3d at 518–19; *Jackson v. Stroud*, 539 S.W.3d 502, 508 (Tex. App.—Houston [1st Dist.] 2017, no pet.). Because these factors—"most especially the comparative juror analysis"—are more easily reviewed on appeal with the benefit of a transcript,[4] the "all relevant circumstances" analysis places a "heavy burden" on trial courts. *Davis*, 268 S.W.3d at 525. "But without [a] searching inquiry into the basis of the challenged strikes, *Batson* would become a 'mere exercise in thinking up any rational basis.'" *Id*. (quoting *Miller-El II*, 545 U.S. at 252).

**B.**     ***Hernandez v. New York* and *Chavarria v. State***

We discuss *Hernandez* and *Chavarria* separately not only because they are Murphy's primary authorities, but also because their application favors Murphy at the second *Batson* step but is adverse to Murphy at the third step.

---

[4] This is not inconsistent with the rationale in *Hernandez* for deferential review of trial court *Batson* decisions, because in *Hernandez* the United States Supreme Court spoke of demeanor issues that were best decided by trial courts:

> Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson*, the finding "largely will turn on evaluation of credibility." 476 U.S., at 98, n. 21, 106 S. Ct., at 1724, n. 21. In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province." *Wainwright v. Witt*, 469 U.S. 412, 428, 105 S. Ct. 844, 854, 83 L.Ed.2d 841 (1985), citing *Patton v. Yount*, 467 U.S. 1025, 1038, 104 S. Ct. 2885, 2892, 81 L.Ed.2d 847 (1984).

*Hernandez*, 500 U.S. at 365.

### 1. *Hernandez v. New York*

Hernandez was tried on murder and weapons charges. 500 U.S. at 355. Both the prosecutor and the trial court questioned the entire jury panel and individual jurors regarding their ability to accept the official, English translation of Spanish testimony. *Id*. at 356. In response to Hernandez's *Batson* challenges, the prosecutor explained that two challenged strikes were used on Hispanic, Spanish-speaking prospective jurors because the four complainants and six witnesses for the prosecution all spoke Spanish, their testimony would be translated, and he did not think the prospective jurors' answers indicated they would accept the official interpretation of the testimony. *Id*. at 356–57. The prosecutor pointed to the demeanor of the challenged jurors asserting they had looked away and hesitated before answering his question about accepting the official interpretation. *Id*. at 356.

The Supreme Court decided the Spanish-language reason was race neutral at the second *Batson* step because the prosecutor based it on the prospective jurors' answers about language proficiency and their demeanor. *Id*. at 360. The Court pointed to the prosecutor's explanation that this problem had occurred in previous trials, so he had divided the entire prospective jury panel into two groups based on their answers to his extensive questioning about accepting the official translation—those who would accept the official translation and those who would not—and that Hispanic and non-Hispanic prospective jurors were in each group. *Id*. at 361. "While the prosecutor's criterion might well result in the disproportionate removal

of prospective Latino jurors, that disproportionate impact does not turn the prosecutor's actions into a per se violation of the Equal Protection Clause." *Id*. The Supreme Court explained, "[D]isparate impact should be given appropriate weight in determining whether the prosecutor acted with a forbidden intent, but it will not be conclusive in the preliminary race-neutrality step of the *Batson* inquiry." *Id*. at 362. Further, the relationship of the peremptory strike to a valid exclusion for cause demonstrates the race-neutral character of the peremptory strike. *Id.* at 362–63. English proficiency was a requirement for jury service in New York, as well as federal jury service. *Id*. at 362, 371 (citing 28 U.S.C. § 1865(b)(2), (3)).

In the third *Batson* step in *Hernandez*, the disparate impact insufficient to establish the second step is relevant because, "If a prosecutor articulates a basis for a peremptory challenge that results in the disproportionate exclusion of members of a certain race, the trial judge may consider that fact as evidence that the prosecutor's stated reason constitutes a pretext for racial discrimination." *Id*. at 363. The prosecutor's Spanish-language reason "raised a plausible, though not a necessary, inference that language might be a pretext for what in fact were race-based peremptory challenges" in the context of a trial held in a community with a substantial Hispanic, Spanish-speaking population. *Id*. The Court adopted a deferential standard of review of state court *Batson* determinations and deferred to the trial court's view of the prosecutor's demeanor which appellate courts cannot see, the prosecutor's volunteering his reasons without being asked to do so by the

judge, that the prosecutor did not know which jurors were Hispanic, the fact that the prosecution's witnesses, including the victims, were the same ethnicity as the excluded jurors tended to undercut any motive to exclude Hispanics, and only three challenged jurors could be identified as Hispanic and the prosecutor had legitimate explanations for two of those challenges.[5]  *Id.* at 369–70.  The Court concluded it was not left with a "definite and firm conviction that a mistake has been committed." *Id.* at 370.  "We have said that '[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'" *Id.* at 369.  The Supreme Court concluded, "We find no error in the application by the New York courts of the three-step *Batson* analysis." *Id.* at 372.

### 2.     *Chavarria v. State*

In *Chavarria v. State*, this Court applied *Hernandez* to the sexual assault trial of Chavarria.  The prosecutor struck all the prospective jurors who spoke Spanish including three Hispanics and two non-Hispanic Caucasians.  2000 WL 567072, at *2.  The prosecutor established there would be translation of testimony in Spanish and explained, "[B]ased on my past experience in trying cases where there are interpreters involved, [the jurors] will not follow the official version of the interpreter." *Id*.  The prosecutor even explained his strikes of the two non-Hispanics for the same reason stating, "[T]he danger is still there that they're going to

---

[5] Two excluded Hispanics had siblings with convictions, one of whom had been prosecuted by the same prosecutorial office that prosecuted Hernandez.  *Id*. at 363.

misinterpret what the official record says and use their own definition back in the jury room." *Id.* The prosecutor offered additional race-neutral explanations: goatee and long hair similar to Chavarria, no ties to the community, and close in age to Chavarria for which he had struck other prospective jurors. *Id.* In the third *Batson* step, Chavarria argued the prosecutor's reasons were pretexts, the strikes of the non-Hispanics were "cover," and the challenged "venire persons said they would follow the instruction that the interpretation is the official version." *Id.* at *3. After analyzing the record, this Court opined, "[T]he [prosecutor's] explanation was not based on a [stereotype] concerning race, rather it was based on the prosecutor's past trial experience with Spanish-speaking jurors when an official interpretation of testimony is used. The *Hernandez* court recognizes that this is a possible trial problem." *Id.* Accordingly, this Court concluded, "While this may have had a disparate impact on Hispanics, unless the prosecutor had the intent of causing the impact, the principle of race-neutrality is not violated." *Id.* (citing *Hernandez*, 500 U.S. at 362).

*Chavarria* is not precedential, even for this Court which issued the opinion. *See* TEX. R. APP. P. 47.7(a) ("*Criminal Cases*. Opinions and memorandum opinions not designated for publication by the court of appeals under these or prior rules have no precedential value but may be cited with the notation, '(not designated for publication).'"). We explain our use of *Chavarria* in our analysis of the third *Batson* step here.

### C. Application

#### 1. Step one: prima facie case

At the first step, Mejia bore the burden of establishing a prima facie case of racial discrimination. In his brief, Murphy does not challenge that Mejia established a prima facie case when Mejia argued in the trial court the challenged strikes were used to exclude Hispanic prospective jurors. "Hispanics, though more an ethnic than racial group, have been accorded protection from preclusion based on group status under *Batson.*" *Benavides v. Am. Chrome & Chems., Inc.*, 893 S.W.2d 624, 626 (Tex. App.—Corpus Christi–Edinburg 1994) (citing *Salazar v. State*, 795 S.W.2d 187, 193 (Tex. Crim. App. 1990)), *writ denied*, 907 S.W.2d 516 (Tex. 1995) (per curiam). In addition, the prima facie requirement became moot once Murphy offered a race-neutral explanation for the peremptory strikes and the trial court ruled on the *Batson* challenges. *See Goode*, 943 S.W.2d at 445. We therefore move to step two.

#### 2. Step two: race-neutral explanation

At the second step, Murphy bore the burden of providing a race-neutral explanation for the peremptory strikes. Murphy contends that his reason was race neutral: he gave as his reason that prospective jurors 7 and 20 "will be listening to the Spanish and not to the English interpretation as [they] should" so they "[don't] understand in English well enough, Your Honor, to participate in this trial." He further argues the trial court was required to accept his reason at face value at the second step. We agree.

–22–

In *Hernandez,* the Supreme Court concluded that the prosecutor's decision to strike Spanish-speaking jurors because they would not accept the official translation of the testimony was a race-neutral explanation on its face, even if it had a disparate impact on Hispanic jurors. *Hernandez*, 500 U.S. at 361–63. Following *Hernandez*, we concluded the same in *Chavarria*. 2000 WL 567072, at *3 ("While [the prosecutor's striking of Spanish-speaking jurors] may have had a disparate impact on Hispanics, unless the prosecutor had the intent of causing the impact, the principle of race-neutrality [was] not violated.").[6]

When Mejia objected to the peremptory strikes of prospective jurors 6, 7, and 20, the following exchange occurred:

> [THE COURT]: All right. So all three of those jurors are members of a protected class; namely Hispanic. Okay. So for all three of those, now [Murphy] needs to come up with a neutral explanation as to each of those three strikes.
>
> . . . .
>
> [MURPHY'S COUNSEL]: First, Your Honor, on No. 6 . . . she testified in voir dire that she was involved in an automobile accident herself in which she suffered injuries, including neck pain that she has and continues to have for the past eight years.
>
> [THE COURT]: All right. And number 7.
>
> . . . .
>
> [MURPHY'S COUNSEL]: [I]t's my understanding, Your Honor, that [Mejia] has an interpreter here to interpret his testimony. That means, there's a danger to [Murphy] that [prospective juror 7] will be listening

---

[6] Regrettably, no counsel informed the trial court about the *Hernandez* and *Chavarria* opinions, thereby depriving the trial court of their guidance when making its decision. But Murphy argued the reasoning of both, which sufficiently preserved this issue for appeal.

to the Spanish and not to the English interpretation as he should.  And therefore he was not struck because of his race, he was struck - - or his ethnicity, he was struck because he doesn't understand in English well enough, Your Honor, to participate in this trial.  And by the way, Your Honor, that's the same explanation for number 20.

. . . .

[THE COURT]:  All right.  So interpretation of the explanation.[7]  At step two, the Court will consider the reason offered as neutral unless a discriminatory intent is inherent in the explanation, even if the respondent offers a silly or superstitious explanation for the strike, which I don't find in this case, trial court must assume that the reasons given are true.  The persuasiveness of the explanation becomes an issue only at step three.  If the *Batson* respondent admits the discriminatory characteristic played any role in making a strike, the peremptory strike is constitutionally defective. . . .  As for number 6, I don't find that happened.  7 and 20, just because they speak Spanish is not a reason to strike them.  And that would be, I think, constitutionally defective. . . . Okay. So for 7 and 20, I'm going to find that those strikes are constitutionally defective.  I'm going to eliminate those strikes for [Murphy]. . . .

The record reflects Murphy explained he struck prospective jurors 7 and 20 because they "will be listening to the Spanish and not to the English interpretation as [they] should" so they "[don't] understand in English well enough, Your Honor, to participate in this trial."  Ability to read and write in English is a qualification for jury service.  *See* TEX. GOV'T CODE § 62.102(6).[8]  Counsel's assessment of

---

[7] Throughout this process the trial court read into the record the steps to rule on a *Batson* challenge contained in a widely used litigation guide, so some of the statements by the trial court are in the third person referring to itself.

[8] Although government code section 62.102(6) does not expressly require English-language proficiency, case law has long implied this requirement.  *See Montoya v. State*, 810 S.W.2d 160, 170 (Tex. Crim. App. 1989) (juror's trouble understanding English was grounds for exclusion); *Stillwell v. State*, 466 S.W.3d 908, 912 (Tex. App.—Fort Worth 2015, no pet.) ("read and write" qualification encompasses the ability to understand English).

prospective jurors 7 and 20's ability to participate in trial to accept the official translation is a race-neutral reason aligning with a requirement for jury service. *Hernandez,* 500 U.S. at 363. As the Supreme Court pointed out, if counsel could not independently assess the juror's English ability and object on that basis, then neither could the trial court:

> If we deemed the prosecutor's reason for striking these jurors a racial classification on its face, it would follow that a trial judge could not excuse for cause a juror whose hesitation convinced the judge of the juror's inability to accept the official translation of foreign-language testimony. If the explanation is not race neutral for the prosecutor, it is no more so for the trial judge. While the reason offered by the prosecutor for a peremptory strike need not rise to the level of a challenge for cause, *Batson*, 476 U.S., at 97, 106 S. Ct., at 1723, the fact that it corresponds to a valid for-cause challenge will demonstrate its race-neutral character.

*Hernandez,* 500 U.S. at 362–63. A prospective juror's inability to accept an official interpretation of testimony has been accepted as a race-neutral reason by both the Supreme Court and this Court. *See id.* at 361–63; *Chavarria*. 2000 WL 567072, at *3. Thus, because Murphy provided a race-neutral explanation, the trial court was required to accept the explanation at "face value" and proceed to step three to determine whether the reason was pretext for discrimination.

When the trial court sustained Mejia's objection before allowing Mejia to rebut Murphy's explanation, the trial court overlooked *Batson*'s third step. *See Davis*, 268 S.W.3d at 514–15; *Goode*, 943 S.W.2d at 452 ("Because the party challenging the peremptory strikes has the ultimate burden of persuasion, we

conclude that the trial court should provide the party challenging the strikes . . . a reasonable opportunity to rebut the race-neutral explanations."). We, therefore, conclude the trial court abused its discretion by not following *Hernandez* and by deciding at step two that Murphy's explanation was "constitutionally defective." We conclude in the next section that there was no harm from the trial court's second-step abuse of discretion.

### 3. Step three: purposeful racial discrimination

Although we found above the trial court abused its discretion when it sustained the *Batson* challenge to the strikes of prospective jurors 7 and 20 at the second step of the *Batson* analysis, we proceed to analyze the trial court's ruling in light of the third step for the following reason. The Texas Supreme Court decided that even though a trial court erred when it ruled at the second *Batson* step, that error was harmless because the lawyer asserting the challenge was allowed to make a record of the third step after which the trial court reiterated its ruling. *See Davis*, 268 S.W.3d at 515 ("[T]he error in failing to follow proper procedure was harmless in this case. The trial court permitted Davis to make a bill after the *Batson* hearing, and Davis's counsel addressed Fisk's strikes and the explanations given. After listening to this argument, the trial court again overruled the *Batson* objection"). Here, instead of a bill of exceptions, we have the record of the trial court's third-step analysis pertaining to prospective juror 6 who was also Hispanic. After reviewing the record as we explain below, we conclude we have a sufficient record on which

to evaluate the trial court's ultimate ruling on prospective jurors 7 and 20 (*see, infra*, n.12; *infra*, text at section I.C.3.b). Indeed, at the conclusion of the discussion of the third step, Murphy re-urged the trial court to overrule the *Batson* challenges regarding prospective jurors 7 and 20. The trial court denied Murphy's request stating its ruling as to all three prospective jurors:

> THE COURT: All right. I'm going to deny the strike as to 6. I'm going to maintain it as to 7 and 20, that the Batson challenge as to 7 and 20, I think that's a constitutionally defective argument that you can strike someone because they speak Spanish.

Thus, it appears from the record Murphy and the trial court applied to prospective jurors 7 and 20 their discussion and the trial court's analysis of the third *Batson* step, which had focused on prospective juror 6.

At the third step, Mejia bore the burden of proving purposeful racial discrimination. We consider "all relevant circumstances" including (a) whether a statistical disparity exists between the percentage of Hispanic and non-Hispanic potential jurors who were struck, (b) whether the striking party questioned the Hispanic potential jurors before striking them, and (c) whether the record supports or contradicts the striking party's explanation for its strikes.[9]

---

[9] We do not understand from *Batson* and its progeny these are exclusive. Rather, these are the minimum considerations of "all relevant circumstances" articulated, which here are sufficient for our analysis.

### a. Statistical disparity

A statistical disparity exists between the percentage of Hispanic and non-Hispanic potential jurors Murphy struck. In the original jury panel, ten out of the 40 potential jurors (25%) were Hispanic. After the trial court dismissed potential jurors for cause or hardship, the panel consisted of 31 remaining members, seven of whom were Hispanic and 24 of whom were not (22.5% Hispanic).[10] Using 50% of his strikes on Hispanics, Murphy peremptorily struck three of the remaining seven Hispanic potential jurors (42.9%), but only three of the remaining 24 non-Hispanic potential jurors (12.5%).

In *Davis*, the defendant struck five of the six (83%) African-American potential jurors, but only 5.5% of non-black potential jurors. 268 S.W.3d at 516. Analyzing whether the defendant engaged in purposeful racial discrimination, the supreme court noted that "'[h]appenstance [was] unlikely to produce this disparity.'"

---

[10] The most relevant pool to study is the "strike zone." *See, e.g., Nieto v. State*, 365 S.W.3d 673, 674–75 (Tex. Crim. App. 2012) ("[A]ll of the black venire members in the strike zone were struck by the State."); *see also United States v. Broussard*, 675 F. App'x 454, 456 (5th Cir. 2017) ("government peremptorily struck the three African-Americans who remained in the strike zone"). The strike zone is the number of jurors to be seated plus the aggregate number of peremptory strikes assuming no overlap; for this district court case, that would be 12 jurors + 12 total peremptory strikes (six per side) = 24. Mathematically, no remaining prospective jurors further back in the panel could be seated as jurors, so all remaining jurors beyond the strike zone will be excused because they are not needed. Here, after strikes for cause, 31 prospective jurors remained; 7 Hispanics and 24 non-Hispanics. If only the 3 Hispanics Murphy struck were seated in the strike zone and the remaining 4 were beyond the strike zone, then Murphy would have struck 100% of the relevant pool of Hispanics. Conversely, if all 7 Hispanics were seated among the first 24, the percentage calculations in the text would be correct. Unfortunately, we cannot make that evaluation here because our record does not contain the jury list, peremptory challenge forms, and a discussion in the record and ruling by the trial court about which prospective jurors were Hispanic and where they were seated. Because we do not have the necessary data in our record, the Texas Supreme Court and United States Supreme Court have not mandated the statistical *Batson* analysis be limited to the strike zone, and our analysis does not rely heavily on the statistics, we will base our analysis on the record of the trial court's discussion with counsel of the entire venire panel after strikes for cause were granted.

*Id.* (quoting *Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 342 (2003) (prosecution struck 91% of the eligible African-American venire members)). The disparity in this case was not as wide as that in *Davis* or *Miller-El I*, but striking 42.9% of the potential Hispanic jurors while striking only 12.5% of the non-Hispanic potential jurors weighs against the race-neutrality of Murphy's strikes in our review of the "totality of the circumstances." *Id.*; *see Haynes v. Union Pac. R.R. Co.*, 395 S.W.3d 192, 197 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (using four peremptory strikes to strike "67% of the potential black jurors while striking only 11% of the eligible nonblack venire members was similarly unlikely to be produced by happenstance").

Further weighing against racial neutrality is Murphy's attempt in the record to strike even more Hispanic prospective jurors (number 30 was also Hispanic):

> [MURPHY'S COUNSEL]: And if your Honor had let 20 go for cause
> . . . I would have struck 30. . . . So if [Mejia's counsel] will grant me
> one extra peremptory strike and I can strike 30, then we're good.

> [MEJIA'S COUNSEL]: No way.

### b.     *Murphy's non-questioning of prospective jurors*

Highly significant to our evaluation of this record is Murphy's failure to ask any questions relevant to his stated reason for peremptory strikes. We note, first and foremost, the topic of Spanish testimony's being translated into English was not raised by anyone during their questioning of the venire panel, most importantly not by Murphy. So the venire panel did not know there would be testimony in Spanish

that would be translated and that they would be instructed they must accept the official translation even if they understood the testimony in Spanish.[11]  As a result, no prospective jurors had the opportunity to volunteer they might have difficulty doing so or to ask questions for clarification of their duty.

Murphy failed to question prospective jurors 7 and 20 as to whether they would accept the official translation of Mejia's Spanish-language testimony. Murphy questioned the jurors about their occupation and other matters pertaining to the case but never questioned them about his claimed reason for striking them. Moreover, Juror Nos. 7 and 20 were two of four potential jurors the trial court called back for individual examination concerning their English-language proficiency.  *See* TEX. GOV'T CODE § 62.102(6).[12]  During those individual examinations, Murphy did not question prospective juror 7.  Although Murphy questioned prospective juror 20, no question inquired about her ability and willingness to accept the testimony's official translation.

Most significantly, Murphy never asked the entire panel if any of them spoke Spanish to learn whether there were bilingual prospective jurors, Hispanic and non-Hispanic, who had no difficulty communicating in both languages.  This is different from the trial court's questioning regarding who had difficulty understanding

---

[11] On the second day of trial after opening statements and immediately preceding the trial court administered the oath to the translator in front of the jury, the trial court instructed the jury that they must accept the translation given by the translator even if they understood the Spanish testimony.

[12] *See supra* n.10.

English. A large number of non-Hispanic Texans understand or speak English and Spanish and, as the prosecutor in *Chavarria* stated, both Hispanics and non-Hispanics might listen to the Spanish testimony and not accept the English translation. *See Chavarria*, 2000 WL 567072, at *2. Because Murphy never asked this of the panel at large, Murphy did not peremptorily strike non-Hispanic Spanish speakers for the reason he gave for his strikes of prospective jurors 7 and 20. Nor can we evaluate whether he passed over striking non-Hispanic Spanish speakers who might have been similar to jurors 7 and 20. The absence of this information from the record results solely from Murphy's failure to ask questions related to his stated reason for his peremptory challenges and not from the trial court's ruling at the second *Batson* step. And the only plausible reasons not to ask non-Hispanics if they spoke Spanish and might not accept the official translation are (1) Murphy made up the translation reason only after his strikes were challenged when he no longer had opportunity to ask questions or (2) Murphy consciously or subconsciously targeted Hispanics using Spanish fluency as a surrogate for a race/ethnic basis for his strikes and was not concerned if non-Hispanics might also be unable to accept the official translation.

We acknowledge this might have been unconscious oversight by Murphy's counsel as opposed to conscious targeting of Hispanics. But even as an unconscious

assumption, it operates to target Hispanic prospective jurors.[13] Questioning of non-Hispanic Spanish speakers' ability to accept the official translation was important to the reasoning of the two courts that affirmed denial of *Batson* challenges for the reason Murphy asserts. *See Hernandez*, 500 U.S. at 361 (prosecutor divided venire panel into two groups—those that could accept official translation and those that would not—and Hispanic and non-Hispanic prospective jurors were in each group); *Chavarria*, 2000 WL 567072, at *2 (prosecutor struck three Spanish-speaking Hispanics and two Spanish-speaking non-Hispanics because he equally doubted each one's ability to accept official translation).

Murphy's failure to inquire regarding the substance of the reason given is in and of itself indicia that the reason is pretextual. The Texas Supreme Court summarized some cases on point:

---

[13] *See Davis*, 268 S.W.3d at 525:

> The trial lawyer's failure to [justify a peremptory strike in the third *Batson* step] does not suggest personal racial animosity on his part. *See, e.g.*, Antony Page, *Batson's Blind Spot: Unconscious Stereotyping and the Peremptory Challenge*, 85 B.U.L. REV. 155, 160–61, 184 (2005) (noting that "research has compellingly demonstrated the existence of unconscious race- and gender-based stereotyping").
>
> . . . .
>
> The concurrence suggests that we ascribe sinister motives to Fisk's counsel. The question presented, however, is not whether this particular advocate harbors ill will, but whether the record explains, on neutral grounds, a statistically significant exclusion of black jurors. It is not enough, under the Supreme Court precedent we examine here, that the lawyer be pure of heart. We assume that he is. Our holding depends not on the personal sentiments of the advocate but on the state of the record.

Here, we decide even if Murphy's failure to question non-Hispanic prospective jurors about their ability to accept the official translation was not consciously the result of targeting Hispanics, which we will assume following *Davis*, the negative inference from that conduct is still computed in the *Batson* calculus without discount for "purity of heart."

Fisk's failure to question Daigle about his purported reaction also suggests that Daigle's reaction had little to do with Fisk's strike. *Miller–El II*, 545 U.S. at 246, 125 S. Ct. 2317 (noting that the prosecution's failure to question prospective juror about reason given for strike suggested pretext; prosecutor "probably would have [questioned him] if the family history had actually mattered") (citing *Ex parte Travis*, 776 So. 2d 874, 881 (Ala. 2000) ( "[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination.")); *Alex v. Rayne Concrete Serv.*, 951 So. 2d 138, 154 (La. 2007) (noting that "the lack of questioning or mere cursory questioning before excluding a juror peremptorily is evidence" of pretext).

*Davis*, 268 S.W.3d at 519. The logic expressed in these opinions is if the reason for the peremptory strike really mattered, the party exercising the peremptory strike would have asked about it. Unlike the prosecutors in *Hernandez* and *Chavarria*, on this record Murphy's failure to question the entire venire panel and prospective jurors 7 and 20 about their willingness to accept the official translation of the testimony suggests this reason had little to do with Murphy's strikes. *See Davis*, 268 S.W.3d at 519.

### c. *Whether record supports or contradicts explanation*

Moreover, equally striking minority and non-minority prospective jurors who share the same issue or characteristic on which the peremptory strike is based is an important consideration in evaluating a *Batson* challenge. *See Davis*, 268 S.W.3d at 519 ("Fisk did not strike Vinzant, a white juror who stated that he would not have a problem awarding punitive damages.") (citing and summarizing *Miller–El II*, 545 U.S. at 248 as "holding that evidence of pretext exists if a reason applies equally to

–33–

other panel members, who were not minorities and not struck"). By failing to elicit from the entire venire panel their ability to understand Spanish and their ability to accept the official translation of Spanish testimony, Murphy insulated himself from our review to determine whether he passed over non-Hispanic prospective jurors who answered similarly to Hispanics in the panel.

Our review of the record indicates every aspect of the third step of the *Batson* analysis weighs against Murphy's stated reason for peremptorily striking prospective jurors 7 and 20. "We have said that '[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'" *Hernandez*, 500 U.S. at 369. Here, we do not think there are even two possible views of the record, just the one the trial court chose. We cannot say the trial court acted without reference to guiding principles or otherwise abused its discretion.

The Supreme Court warned courts not to engage in "thinking up any rational basis" to validate peremptory strikes that were not urged in the record. *See Miller-El II*, 545 U.S. at 252 ("A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false."). We acknowledge that peremptory strikes are often based on instinct rather than reason, so sometimes they can be difficult to justify. And we do not suggest that Murphy's failure to justify his

peremptory strikes implies personal animosity on his part. *See Davis*, 268 S.W.3d at 525. Mejia sought jurors favorably inclined to his case and Murphy sought jurors favorably inclined to his. Because Mejia was Hispanic, for Murphy race may have even served as a "rough proxy for partiality" of prospective jurors. *Id*. The Constitution, however, forbids the strategic advantages of that practice. *Id*. Therefore, after examining all the relevant circumstances on this record, we conclude the trial court's ultimate decision sustaining Mejia's *Batson* challenges when reviewed based on the third *Batson* step was not an abuse of discretion. We overrule Murphy's first issue.

## II. Mejia's Motion for Leave to Amend his Petition and Judgment Exceeding $200,000

Murphy's second issue presents a matter of first impression. Murphy contends that, as a matter of law, Mejia cannot recover more than $200,000, the maximum amount pleaded in the original and first amended petitions. Specifically, Murphy argues (i) a trial court cannot grant a motion for leave to amend the pleadings after the court renders judgment, and (ii) the judgment does not conform to the pleadings because Mejia's first amended petition was his live pleading, not his second amended petition. In his motion for en banc rehearing, Mejia argues for the first time his motion for leave was not filed post-judgment because the amended judgment vacated the original judgment, so the operative date of judgment is September 18, 2018, the date the trial court signed the amended judgment. Mejia

therefore argues his motion and the order granting leave to file an amended pleading were pre-judgment so we should affirm the judgment of the trial court.[14]  We agree with Mejia's argument for the following reasons.

We review a trial court's ruling on a motion for leave to file a trial amendment for abuse of discretion.  *See Greenhalgh v. Serv. Lloyds Ins. Co.*, 787 S.W.2d 938, 940 (Tex. 1990).  A trial court abuses its discretion when its action is arbitrary and unreasonable or when it acts without reference to guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

The trial court received the verdict on July 25, 2018.  The chronology of events[15] important to our decision began on August 9, 2018, when the trial court

---

[14] We are unpersuaded by Mejia's other argument in his motion for rehearing en banc, that the trial court's oral pronouncement on September 14 vacating the August 9 judgment was effective without written order.  *See McCormack v. Guillot*, 597 S.W.2d 345, 346 (Tex. 1980) (absent written order, oral pronouncement of new trial or reform, modification, or vacatur of final judgment is ineffective); *see generally Kaur-Gardner v. Keane Landscaping, Inc.*, No. 05-17-00230-CV, 2018 WL 2191925, at *4 (Tex. App.—Dallas May 14, 2018, no pet.) (mem. op.) (In civil cases, "the trial court's written conclusion that [the parties] had an express contract controls over the trial court's oral statements that a contract did not exist."); *Sherman v. Triton Energy Corp.*, 124 S.W.3d 272, 279 (Tex. App.—Dallas 2003, pet. denied) (In civil cases, "the written final judgment prevails over the prior oral pronouncement").  Mejia also argues the order granting leave to file the second amended petition impliedly vacates the original final judgment, but there is nothing in the text of the order or the context of events that can give rise to this implication.

[15] August 6, 2018—Mejia moved for judgment on the verdict.

August 9, 2018—The trial court signed a final judgment.

August 14, 2018—Murphy filed his response to the motion for entry of judgment apparently unaware that judgment had been signed.  Murphy argued Mejia could not recover damages in excess of the maximum pleaded of $200,000 and that the interest was not calculated correctly.

August 20, 2018—Murphy filed a motion for new trial and a separate motion for judgment notwithstanding the verdict and to disregard the jury's verdict in each of which he raised insufficiency of the evidence issues not asserted on appeal.  That same day, Murphy also filed an amended motion to modify, correct, or reform the judgment in which he argued damages were limited by the $200,000 pleaded amount and the incorrect calculation of interest.

signed the first judgment. On September 7, 2018, Mejia filed a motion for leave to file his second amended petition together with the amended petition.[16] On September 14, 2018, the trial court heard several motions including Mejia's motion for leave. At the conclusion of the hearing, the trial court orally rendered its decision to vacate the original final judgment but did not sign a written order so providing. Also, the trial court took Mejia's motion for leave to amend his petition under advisement. On September 18, the trial court signed both an order granting Mejia leave to file his second amended petition and an amended final judgment.

We agree, as Murphy argues, that a trial court cannot grant a motion for leave to amend the pleadings after final judgment. *See Greenhalgh*, 787 S.W.2d at 940 ("It is well established that a party may amend its pleadings after verdict but before judgment."). "The judgment of the court shall conform to the pleadings, the nature of the case proved and the verdict. . . ." TEX. R. CIV. P. 301; *see also Concrete Constr. Supply, Inc. v. M.F.C., Inc.*, 636 S.W.2d 475, 483 (Tex. App.—Dallas 1982,

September 7, 2018—Mejia filed his motion for leave to amend his pleading to plead for $1,200,000 to conform to the jury's verdict and attached the signed second amended petition. That same day, Mejia filed a motion to reform the judgment regarding taxable costs.

September 14, 2018—The trial court heard the motions and announced it vacated the judgment because of the agreed error in interest and told the parties to work out the other issues. Later that afternoon, Murphy filed an amended motion withdrawing his complaint about the interest in the judgment but re-urging the trial court to limit the judgment to $200,000.

September 17, 2018—Murphy objected to Mejia's form of order setting aside the judgment.

September 18, 2018—The trial court signed the order granting Mejia leave to file his amended pleading and also signed the amended final judgment.

[16] For our purposes, we will treat the second amended petition as having been filed that day. *See* TEX. R. CIV. P. 21(f)(5)(B) ("[I]f a document requires a motion and an order allowing its filing, the document is deemed filed on the date that the motion is granted.").

no writ) ("In its rendition of judgment, the trial court is restricted to the 'top dollar' alleged in plaintiff's pleadings."). We must reform a money judgment in excess of the amount pleaded to conform the judgment to the pleading. *See Concrete Constr.*, 636 S.W.2d at 483 (reducing judgment to conform to pleadings). Murphy presented these arguments to the trial court before the trial court granted Mejia leave to amend and before the trial court signed the second final judgment.

Mejia is correct, however, that pursuant to rules 63 and 66 of the Texas Rules of Civil Procedure, a trial court must allow a post-verdict amendment that increases the amount of damages sought in the pleadings to that found by the jury unless the opposing party presents evidence of prejudice or surprise. *Greenhalgh*, 787 S.W.2d at 939; *Hampden Corp. v. Remark, Inc.*, 331 S.W.3d 489, 498 (Tex. App.—Dallas 2010, pet. denied) (trial court must allow amendment to pleading if merely procedural such as conforming pleadings to evidence at trial) (citing *Chapin & Chapin, Inc. v. Tex. Sand & Gravel Co.*, 844 S.W.2d 664, 665 (Tex. 1992) (per curiam)). A post-verdict amended pleading that changes only the amount of damages sought does not automatically operate as surprise pursuant to Rule 63. *Greenhalgh*, 787 S.W.2d at 940. Instead, the party opposing the amended pleading must present evidence to show that the increase resulted in surprise. *Id.* Murphy presented no evidence of surprise in the trial court and does not argue here an increased pleading operates as surprise. Solely with regard to the merits of the motion for leave, the trial court did not abuse its discretion in granting Mejia leave

to amend his petition and awarding judgment in the amount awarded by the jury. The dispositive issue, therefore, is whether or not Mejia filed his motion for leave post-judgment.

A subsequent judgment titled "amended judgment" sufficiently demonstrates a trial court's intent that "the second judgment reformed and, in effect, vacated the first judgment." *Azbill v. Dallas Cty. Child Protective Servs. Unit of Tex. Dep't of Human & Regulatory Servs.*, 860 S.W.2d 133, 139 (Tex. App.—Dallas 1993, no writ) (citing *B & M Machine Co. v. Avionic Enters., Inc.*, 566 S.W.2d 901, 902 (Tex. 1978)). The amended final judgment signed on September 18, 2018 changed the amount of interest awarded, so it was the final judgment for purposes of calculation of appellate deadlines. *See Check v. Mitchell*, 758 S.W.2d 755, 756 (Tex. 1988) (per curiam) ("We hold that any change, whether or not material or substantial, made in a judgment while the trial court retains plenary power, operates to delay the commencement of the appellate timetable until the date the modified, corrected or reformed judgment is signed."). There is no doubt on this record the trial court intended the September 18 amended final judgment to vacate the August 9 final judgment, because the trial court orally pronounced it vacated the August 9 judgment at the September 14 hearing, four days before it signed the amended final judgment. When the trial court signed the amended judgment, it vacated the August 9 judgment.

"A judgment that has been vacated has no legal effect." *Pringle v. Moon*, 158 S.W.3d 607, 610–11 (Tex. App.—Fort Worth 2005, no pet.) (citing *Shelby*

–39–

*Operating Co. v. City of Waskom*, 964 S.W.2d 75, 80 (Tex. App.—Texarkana 1997, pet. denied)). Stated more fully, "[w]hen a judgment has been rendered and later set aside or vacated, the matter stands precisely as if there had been no judgment." *Id.* at 610-611 (citing *Ferguson v. Naylor*, 860 S.W.2d 123, 127 (Tex. App.—Amarillo 1993, writ denied); *Sawyer v. Donley Cty. Hosp. Dist.*, 513 S.W.2d 106, 109 (Tex. App.—Amarillo 1974, no writ)). Thus, where a statutory interest rate is changed between the first and second judgment, it is the interest rate in effect at the time the second judgment is signed that controls notwithstanding the trial court's intent for the second judgment to relate back to the first. *Id.*

Here, when the trial court signed the September 18 amended final judgment vacating the August 9 judgment, it was "as if there had been no [August 9] judgment," so Mejia's motion for leave to file his second amended petition was filed eleven days before the operative final judgment was signed on September 18, 2018. *Id.*; *see also Mayhew v. Dealey*, 143 S.W.3d 356, 371 (Tex. App.—Dallas 2004, pet. denied) (motion for leave to file amended pleading filed same day final judgment is signed deemed filed before signing of final judgment).[17]

---

[17] Contrary to this conclusion, Murphy argues in his opening brief that once a final judgment is signed, even if it is thereafter vacated, any motion for leave to amend a pleading is necessarily post-judgment and a trial court abuses its discretion to grant it. Murphy does not cite direct authorities for that argument, just the general authorities we cited above for the proposition a motion to amend pleadings must be filed before judgment. Murphy's argument fails to take into account the effect of vacatur of a judgment on the posture of a case in the trial court.

Having concluded the trial court did not abuse its discretion in granting Mejia's motion to file his second amended petition filed before the September 18, 2018 amended final judgment, it follows the trial court did not err in granting judgment in the full amount awarded by the jury. Because we resolve Murphy's second issue against him, we affirm the trial court's judgment in its full amount.

## CONCLUSION

We conclude when reviewed based on the record of the third *Batson* step the trial court did not abuse its discretion in sustaining Mejia's *Batson* challenges as to Hispanic prospective jurors 7 and 20. The United States Supreme Court noted, "Our decision today does not imply that exclusion of bilinguals from jury service is wise, or even that it is constitutional in all cases." *Hernandez*, 500 U.S. at 371. In this case on this record, the trial court did not abuse its discretion by ruling that peremptory strikes of two Hispanics were not constitutional.

We further conclude the trial court did not abuse its discretion when it granted Mejia's motion for leave to amend his second amended petition, so the trial court did not err when it awarded damages in excess of $200,000. We therefore affirm the trial court's judgment.

/David Evans/
DAVID EVANS
JUSTICE

181342F.P05

–41–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

KENNETH D. MURPHY, Appellant

No. 05-18-01342-CV     V.

ALFONSO FELIPE MEJIA ARCOS,
Appellee

On Appeal from the 68th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-16-11187.
Opinion delivered by Justice Evans.
Justices Myers and Carlyle participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee ALFONSO FELIPE MEJIA ARCOS recover his costs of this appeal from appellant KENNETH D. MURPHY.

Judgment entered December 11, 2020.